UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| SHARON ABELMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:20 CV 249 RWS |
| | ) | |
| ANDREW SAUL, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM AND ORDER**

Plaintiff Sharon Abelman brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of the Commissioner's decision denying her application for disability insurance benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401. Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a final decision of the Commissioner. Because the Commissioner's final decision is not supported by substantial evidence on the record as a whole, I will reverse the decision of the Commissioner and remand for further proceedings consistent with this Memorandum and Order.

### **Procedural History**

Plaintiff was born in 1966 and alleges she became disabled beginning January 14, 2016, because of diabetes, bipolar disorder, and depression. (Tr. 258).

Plaintiff's application was initially denied on March 31, 2016.  After a two-part hearing before an ALJ on January 29, 2018 and July 10, 2018,[1] the ALJ issued a decision denying benefits on September 7, 2018.  On December 10, 2019, the Appeals Council denied plaintiff's request for review.  The ALJ's decision is thus the final decision of the Commissioner.  42 U.S.C. § 405(g).

In this action for judicial review, plaintiff contends that the ALJ erred in her assessment of the medical evidence when fashioning her residual functional capacity.  Plaintiff asks that I reverse the Commissioner's final decision and remand the matter for further evaluation.  For the reasons that follow, I will reverse the Commissioner's decision.

## Medical Records and Other Evidence Before the ALJ

With respect to the medical records and other evidence of record, I adopt plaintiff's recitation of facts (ECF #13-1) as they are admitted by the Commissioner (ECF #14-1).  Additional specific facts will be discussed as needed to address the parties' arguments.

## Discussion

A.   Legal Standard

To be eligible for disability insurance benefits under the Social Security Act,

---

[1] The hearing was adjourned in January and rescheduled for July because the ALJ believed plaintiff was intoxicated at the first hearing and could not give appropriate testimony.  (Tr. 20.)  Plaintiff denied being intoxicated.  (Tr. 79.)

plaintiff must prove that she is disabled.  *Pearsall v. Massanari,* 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  *See* 20 C.F.R. § 404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If the claimant is working, disability benefits are denied.  Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities.  If the claimant's impairment(s) is not severe, then she is not disabled.  The Commissioner then determines whether claimant's impairment(s) meets or equals one of the

3

impairments listed in 20 C.F.R., Part 404, Subpart P, Appendix 1.  If claimant's

impairment(s) is equivalent to one of the listed impairments, she is conclusively

disabled.  At the fourth step, the Commissioner establishes whether the claimant

can perform her past relevant work.  If so, the claimant is not disabled.  Finally, the

Commissioner evaluates various factors to determine whether the claimant is

capable of performing any other work in the economy.  If not, the claimant is

declared disabled and becomes entitled to disability benefits.

I must affirm the Commissioner's decision if it is supported by substantial

evidence on the record as a whole.  42 U.S.C. § 405(g); *Richardson v. Perales*, 402

U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002).

Substantial evidence is less than a preponderance but enough that a reasonable

person would find it adequate to support the conclusion.  *Johnson v. Apfel*, 240

F.3d 1145, 1147 (8th Cir. 2001).  Determining whether there is substantial

evidence requires scrutinizing analysis.  *Coleman v. Astrue*, 498 F.3d 767, 770 (8th

Cir. 2007).

I must consider evidence that supports the Commissioner's decision as well

as any evidence that fairly detracts from the decision.  *McNamara v. Astrue*, 590

F.3d 607, 610 (8th Cir. 2010).  If, after reviewing the entire record, it is possible to

draw two inconsistent positions and the Commissioner has adopted one of those

positions, I must affirm the Commissioner's decision.  *Anderson v. Astrue*, 696

F.3d 790, 793 (8th Cir. 2012).  I may not reverse the Commissioner's decision

merely because substantial evidence could also support a contrary outcome.

*McNamara*, 590 F.3d at 610.

When evaluating evidence of pain or other subjective complaints, the ALJ is

never free to ignore the subjective testimony of the claimant, even if it is

uncorroborated by objective medical evidence.  *Basinger v. Heckler*, 725 F.2d

1166, 1169 (8th Cir. 1984).  The ALJ may, however, disbelieve a claimant's

subjective complaints when they are inconsistent with the record as a whole.  *See*

*e.g., Battles v. Sullivan*, 902 F.2d 657, 660 (8th Cir. 1990).  In considering the

subjective complaints, the ALJ is required to consider whether a claimant's

subjective complaints are consistent with the medical evidence.  *See Polaski v.*

*Heckler*, 739 F.2d 1320 (8th Cir. 1984) (listing factors such as the claimant's daily

activities, the duration, frequency, and intensity of the pain, precipitating and

aggravating factors, dosage, effectiveness and side effects of medication, and

functional restrictions).[2]  When an ALJ gives good reasons for the findings, the

---

[2] This was once referred to as a credibility determination, but the agency has now eliminated use of the term "credibility" to clarify that subjective symptom evaluation is not an examination of an individual's character.  However, the analysis remains largely the same, so the Court's use of the term credibility refers to the ALJ's evaluation of whether a claimant's "statements about the intensity, persistence, and limiting effects of symptoms are consistent with the objective medical evidence and other evidence of record."  *See* SSR 16-3p, 2017 WL 5180304, at *8 (Oct. 25, 2017); 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3); *Lawrence v. Saul*, 2020 WL 4375088, at *5, n.6 (8th Cir. Jul. 31, 2020) (noting that SSR 16-3p "largely changes terminology rather than the substantive analysis to be applied" when evaluating a claimant's subjective complaints).

court will usually defer to the ALJ's finding.  *Casey v. Astrue*, 503 F.3d 687, 696

(8th Cir. 2007).  However, the ALJ retains the responsibility of developing a full

and fair record in the non-adversarial administrative proceeding.  *Hildebrand v.*

*Barnhart*, 302 F.3d 836, 838 (8th Cir. 2002).

B.    ALJ's Decision

In her written decision, the ALJ found that plaintiff had not engaged in

substantial gainful activity since the alleged onset date of January 14, 2016.  The

ALJ found that plaintiff had the following severe impairments: diabetes, peripheral

neuropathy, bipolar disorder, and generalized anxiety disorder.  The ALJ

determined that plaintiff's impairments or combination of impairments did not

meet or medically equal a listed impairment in 20 C.F.R. Part 404, Subpart P,

Appendix 1.  (Tr. 22.)  The ALJ found plaintiff to have the residual functional

capacity (RFC) to perform medium work with the following limitations:

> [C]laimant can never climb ropes, ladders or scaffolds.  The claimant
> must have no exposure to heights or hazardous machinery.  The
> claimant is limited to simple, routine tasks with minimal changes in
> job setting and duties.  The claimant must have no contact with the
> general public and only occasional contact with coworkers and
> supervisors.  The claimant must not have fast paced production work.

(Tr. 24.)  The ALJ relied upon vocational expert testimony to support a conclusion

that plaintiff could not perform her past relevant work as a home health aide and

mail processor/handler  (Tr. 29.), but that there were significant jobs in the

economy of laundry worker, machine feeder, or hand packager that plaintiff could perform.  The ALJ therefore found plaintiff not to be disabled.  (Tr. 30.)

Plaintiff claims that this decision is not supported by substantial evidence because the ALJ improperly assessed her bipolar disorder when formulating her RFC.

C.    <u>RFC</u>

Plaintiff argues that the ALJ erred when formulating the mental portion of her RFC[3] because he failed to consider the properly evaluate her bipolar disorder, which she alleges caused medication noncompliance and would result in significant absenteeism rendering her unable to work.  The Court agrees, and this significant error requires remand.

In this case, between May 30, 2015 (fewer than eight months before the alleged onset date) and January 24, 2018, plaintiff was hospitalized on nine different occasions for a total of 71 days for her bipolar disorder.[4]  The shortest

_____

[3] Plaintiff does not challenge the ALJ's determination with respect to her physical limitations.

[4] They are as follows:

1)  May 30, 2015 to June 6, 2015 at SSM St. Joseph Wentzville (eight days)

2)  February 22, 2016 to February 27, 2016 at SSM St. Joseph Wentzville (six days)

3)  May 23, 2016 to May 27, 2016 at SSM St. Joseph Wentzville (five days)

4)  June 10, 2016 to June 15, 2016 at SSM St. Joseph Wentzville (six days)

length of time she was hospitalized was two days, and her longest stay was sixteen days in July of 2016.  Less than three days after her release from Barnes-Jewish Hospital in July of 2016, she had to be hospitalized again for psychiatric care at DePaul Hospital for another twelve days.

On May 30, 2015, plaintiff went to SSM St. Joseph Wentzville with suicidal ideation, bizarre behavior, auditory hallucinations, and extreme agitation.  (Tr. 472.)  At the time, she has been off psychotropic medications for six years.  She was admitted for a three-day hospital stay with a diagnosis of bipolar disorder and a GAF score of 26-30.  Her mania and depression improved with treatment, and she was discharged with a GAF score of 46-50.  (Tr. 472-75.)

Plaintiff then began psychiatric treatment with Dr. Muhammad Arain, M.D., at Psych Care Consultants.  (Tr. 487-501.)  Dr. Arain diagnosed plaintiff with Bipolar I Disorder, current or most recent episode depressed (or mixed), severe, with psychotic features; other specified Anxiety Disorder; and Generalized Anxiety Disorder.  (Tr. 488-498.)

---

5)  June 28, 2016 to July 8, 2016 at SSM St. Joseph Wentzville (eleven days)

6)  July 14, 2016 to July 29, 2016 at Barnes-Jewish Hospital (sixteen days)

7)  August 1, 2016 to August 12, 2016 at SSM Health – DePaul Hospital (twelve days)

8)  October 13, 2017 to October 17, 2017 at Mercy Hospital Jefferson (five days)

9)  January 23, 2018 to January 24, 2018 at Progress Care Hospital (two days)

On February 22, 2016, plaintiff was admitted to SSM St. Joseph Wentzville reporting depression, lack of motivation, and increased anxiety.  She claimed to be off her psychotropic medications due to financial difficulty.  Her mood and affect were anxious and depressed, her insight and judgment were poor, and she had impaired impulse control.  Dr. Wang diagnosed plaintiff with bipolar disorder without psychotic features and noncompliance with medication regimen.  (Tr. 515.)

Plaintiff then began psychiatric treatment at the Crider Center with Jill Laurentis, MS, Integrated Health Specialist, and Dr. Adolph Herath, M.D.   On March 3, 2016, Dr. Herath diagnosed plaintiff with Bipolar I Disorder, Depressed, and assigned her a GAF score of 48.  On March 31, 2016, Dr. Herath noted that plaintiff had "gone through almost all of the mood stabilizers from Lithium to Latuda without much success."  (Tr. 743.)  Plaintiff continued to seek treatment from Dr. Herath through April 11, 2018.  (Tr. 675-749, 852-87.)

Plaintiff was back in the hospital by May 23, 2016, because she was found by police screaming at cars, talking to people not present, and striking her head into the sidewalk.  (Tr. 751.)  She said she "felt crazy" and suicidal and stated that God wanted her to save the world.  (Tr. 750-71.)  She denied alcohol and drug use and claimed she was taking her medication.  (Tr. 750.)  She was diagnosed with bipolar disorder without psychotic features (with periods of mania) and

noncompliance with medication regimen.  (Tr. 751, 753.)  At the time of discharge on May 27, 2016, plaintiff was much improved and claimed to be back on her medications.  (Tr. 762.)

That improvement was short-lived, however.  On June 4, 2016, plaintiff was taken to a hospital in Litchfield, Illinois after police found her walking barefoot on a highway.  (Tr. 572.)  She had been reported as a missing person in Missouri.  (Tr. 572.)  Plaintiff became aggressive at the hospital, yelling and lunging at the staff.  (Tr. 576.) Plaintiff was diagnosed with a psychotic episode, given medication, and released into police custody.  (Tr. 576.)

Plaintiff was hospitalized again at SSM St. Joseph Wentzville on June 10, 2016, after being off her medication for at least five days and possibly longer.  (Tr. 773.)  She had been living with her family but decided to go to a homeless shelter a week before.  (Tr. 773.)  Plaintiff was kicked out of the shelter for singing and dancing.  (Tr. 773.)  Plaintiff refused medication and voluntary admission, claiming she did not know why she was at the hospital.  (Tr. 773.)  Her husband, however, said she was making homicidal and suicidal threats, engaging in conflicts and assaultive behavior, and was hallucinating and paranoid.  (Tr. 773.)  She was treated with medication and discharged on June 15, 2016, after her condition had improved.  (Tr. 787.)

Less than two weeks later, however, she was back at SSM St. Joseph Wentzville, reporting mania and suicidal ideations.  (Tr. 801.)  She claimed to be on her medications and denied alcohol or drug use.  (Tr. 801.)  Her mood and affect were anxious and volatile, her mood was incongruent, her impulse control was poor, and her insight and judgment were poor.  (Tr. 801.)  Plaintiff was diagnosed with bipolar disorder without psychotic features and noncompliance with medication regime, and was discharged on July 8, 2016, after being given medication.  (Tr. 803, 812-16.)

Within the week, plaintiff was back at the emergency room, this time at Barnes-Jewish Hospital, with worsening bipolar symptoms.  Her husband said plaintiff was threatening him and their children.  (Tr. 601, 606.)  Plaintiff stated that she "is being told that she is bipolar, but all she wants to do is smoke cigarettes, drink tea outside, and 'get things off her chest.'"  (Tr. 603.)  Plaintiff and her husband were arguing.  (Tr. 603.)  Plaintiff was walking in and out of their house all day, not sleeping at night, walked into a storm, threatened to kill her husband and their children, accused people of raping and molesting her, and stated that the CIA was after her.  (Tr. 606.)  Plaintiff denied those symptoms and claimed to be taking her medications.  (Tr. 606.)  Plaintiff stated that she was depressed and that the medications were not working.  (Tr. 608.)  Plaintiff claimed that it was really her husband with psychiatric problems.  (Tr. 608.)  Plaintiff

denied that she needed to be in the hospital.  (Tr. 628.)  She refused to endorse any psychiatric symptoms and claimed that she was stable, even though she was observed to be in a manic phase of her bipolar disorder during her hospital stay. (Tr. 631.)  Plaintiff had psychomotor agitation, with pressured speech and labile affect.  (Tr. 631.)  She had poor insight and judgment.  (Tr. 632.)  She was admitted to the hospital with a diagnosis of bipolar 1 disorder, anxiety disorder, and alcohol use disorder, in remission.  (Tr. 632.)  Plaintiff "presented with profound mania and psychosis and was a very difficult case as evidenced by how long and very challenging it took to maximally control her profound mania and psychosis which for the most part caused her not to have any boundaries creating another challenge of constantly redirecting her to avoid issues with other unstable patients in the unit she was constantly provoking."  (Tr. 643.)  Plaintiff was treated with Lamictal, Risperidone, Hydroxyzine, Fluoxatine, Buspar, Ambien and Doxepin.  (Tr. 643.)  She tolerated her medication well and was released sixteen days later on July 29, 2016.

Three days later, police brought plaintiff to SSM DePaul Health Center after she was found "rocking in the rain."  (Tr. 586.)  Plaintiff was preoccupied with all the "sexual assaults" she said were happening at a mall and in her neighborhood and she wanted to protect her neighborhood and keep children safe.  (Tr. 586.) Plaintiff was diagnosed with bipolar affective disorder 1 with psychotic features,

12

noncompliance with medication regimen, anxiety, and depression.  (Tr. 590.)
After being hospitalized for twelve days, she was discharged with a diagnosis of
bipolar affective disorder with periods of mania, noncompliance with medication
regimen, depression and anxiety.  (Tr. 593.)

After she was released from the hospital, plaintiff appeared to stabilize for a
time.  She continued to see Dr. Herath for monthly medication management.  In
September of 2016, she reported "feeling better" after her medication changes and
stated that she was sleeping better with more energy and improved memory.  (Tr.
677.)  Her GAF score was 52.  (Tr. 677.)  She had similar reports and examinations
within normal limits in October and November.  (Tr. 677-82).  In December,
plaintiff continued to report that she was doing well and claimed that she was
making decisions on her own, but examination showed constricted affect and
partial insight.  (Tr. 683-84.)   Plaintiff had similar normal examinations during the
first part of 2017.  (Tr. 866-97.)  By May, however, she told Dr. Harath that she
sometimes felt depressed.  (Tr. 714.)   Her examination was within normal limits
except for fair judgment and insight.  (Tr. 715-16.)  Dr. Harath coded plaintiff as
"patient with 2+ stable Dx or 1+ Dx with mild exaberation, low medical decision
making."  (Tr. 718.)  In June, plaintiff reported feeling depressed for at least two
weeks, stating that she did not want to get out of bed or perform any chores, and
that she feels sad and like crying in the afternoons.  (Tr. 708.)  Plaintiff missed her

next few scheduled appointments with Dr. Harath, claiming that he was in the hospital.  (Tr. 533.)

On October 13, 2017, plaintiff arrived at Mercy Hospital Jefferson as a direct involuntary admission from Barnes-Jewish St. Peters emergency room for suicidal ideation and depression after intentionally walking out into traffic (Tr. 533.)  Plaintiff reported increasing depression over the past months and stated that she had suicidal thoughts over the last week.  (Tr. 533.)  She stated that she had been on "so many" medications and that they did not help.  (Tr. 533.)  Plaintiff was noted to be a "poor historian" with impaired insight and judgment.  (Tr. 533.)  She was assigned a GAF score of 35 upon admission.  (Tr. 533.)  Enquan Gao, M.D. diagnosed plaintiff with bipolar disorder current depressed with psychotic features. (Tr. 532.)  Her symptoms included difficulty in falling and staying asleep, fair appetite, low energy, severe anhedonia, depression, anxiety, and paranoia.  (Tr. 534.)  Plaintiff was noted to have limited coping skills.  (Tr. 540.)  During her stay, plaintiff reported noncompliance with medication regimen, saying that she was too depressed to take her medication.  (Tr. 548.)  In a discharge summary on October 17, 2017, Peter Zhang, M.D., diagnosed plaintiff with bipolar disorder current depressed with psychotic features and said that plaintiff's condition had stabilized during her stay.  (Tr. 560.)  During her follow up for diabetes with Ranjani Ramanathan, M.D., on October 25, 2017, she reported a worsening of depression

14

but claimed she was "doing better" with her bipolar disorder.  (Tr. 649.)  During her November visit with Dr. Herath, plaintiff reported having difficulty remembering her medications but stated she no longer felt suicidal and was sleeping and eating well.  (Tr. 878.)  Her noncompliance with medications was noted.  (Tr. 878.)  Upon examination, plaintiff was noted to have fair grooming and eye contact, with an anxious affect, and fair judgment and insight, but her other results were within normal limits.  (Tr. 880-81.)

On January 23, 2018, plaintiff was seen at Progress West emergency room and Barnes-Jewish St. Peters emergency room for hallucinations and delirium.  (Tr. 845, 850-51.)  Her admission diagnosis was phencyclidine intoxication delirium.  (Tr. 851.)  Plaintiff denied using PCP and thought maybe someone had slipped it into her drink.  (Tr. 851.)  Plaintiff's encephalopathy was thought to be toxic from PCP use since the drug went out of her system and she returned to her baseline.  (Tr. 851.)  She was discharged on January 24, 2018 and advised to follow up with her psychiatrist.

Plaintiff first appeared before the ALJ for an administrative hearing in this case on January 29, 2018.  Plaintiff testified at that hearing, which was adjourned by the ALJ due to her belief that plaintiff was intoxicated.  (Tr. 27-28.)  The ALJ continued the hearing to July 10, 2018, and plaintiff against testified.  (Tr. 71-103.)  Plaintiff denied taking PCP.  (Tr. 79.)  Plaintiff testified that her bipolar disorder

makes it difficult to concentrate, and that she has lethargy, drowsiness, fatigue, and wearing off of medications.  (Tr. 78-79.)  Plaintiff testified that despite being on numerous medications she continues to have auditory hallucinations one or two times per week, suicidal thoughts on a monthly basis, and manic episodes where she stays up for days, doing and thinking "crazy thoughts," followed by extreme exhaustion.  (Tr. 81-84.)  Her anxiety makes it difficult to go to the grocery store by herself or be around people.  (Tr. 87.)  On good days she takes her dog for a walk and tries to read or watch television and cook dinner.  (Tr. 88.)  On bad days she stays in bed.  (Tr. 89.)

During her visit with Dr. Herath on February 20, 2018, plaintiff expressed concern that she was found to have taken PCP because "she never indulged in the use of any kind."  (Tr. 852.)  She and her husband were worried about how it would affect her application for benefits.  (Tr. 852.)  Plaintiff missed multiple appointments with the social worker assigned to her through the Crider Center in March of 2018.  (Tr. 908-14.)  By April 11, 2018, plaintiff stated that her memory was "not too sharp."  (Tr. 860.)  Her grooming and eye contact were fair, she could not recall phrases, and she had fair judgment and insight, but the remaining results of her examination were within normal limits.  (Tr. 862-63.)  Dr. Herath upgraded her assessment to "patient with 2+ Dx with exacerbation, moderate medical decision making."  (Tr. 865.)

In reviewing the evidence of plaintiff's bipolar disorder, the ALJ concluded that plaintiff was not disabled because her periods of hospitalization, which she dubbed "exacerbations," did not meet the "12-month duration of the extreme limits." (Tr. 28.) The ALJ found that "claimant's exacerbations requiring hospitalizations are accompanied by medication non-compliance and non-prescribed drug usage. Considering the positive response when compliant with treatment, the undersigned finds the claimant retains the mental residual functional capacity for simple, routine tasks with minimal changes in job setting and duties . . . . The undersigned finds that, to the extent the claimant may have exhibited greater functional limitations in periods of exacerbations, these limits were not sustained at the exacerbation level for a period of at least 12 continuous months, and generally occurred in periods of medication non-compliance and possible drug use." (Tr. 28.)

Plaintiff contends that the ALJ substantially erred in her findings regarding her bipolar disorder[5] by failing to consider that plaintiff's medication

---

[5] Plaintiff's medical records in this case exceed 900 pages and date back to 2009, when plaintiff was hospitalized for two days for her bipolar disorder after complaining of hearing voices and not sleeping for more than a week. The admitting physician, Dr. William Wang, M.D., Ph.D., assessed plaintiff with bipolar I disorder with medication noncompliance, and a Global Assessment Functioning (GAF) score of 36-40. On August 5, 2009, plaintiff visited the emergency room for anxiety, and was again hospitalized for psychiatric care from August 6 through August 13, 2009, after the police brought her in for evaluation after unsafe and disruptive behavior. Her GAF score during her stay ranged from 31-35. The only consultative psychological examination in the record was performed by Thomas J. Spencer, Psy.D. on September 21, 2009, in connection with a prior withdrawn application for benefits. Dr. Spencer

noncompliance is a symptom of her disorder and should therefore not be held against her when fashioning her RFC.  The Commissioner argues that "the record does not establish plaintiff's noncompliance with treatment was caused by her mental impairment," but was instead "caused by financial issues."  [Doc. # 14 at 8].  The Commissioner then argues that "plaintiff's noncompliance is irrelevant to the issue in this case" because "the ALJ properly found that the exacerbations did not satisfy the 12-month durational requirement."  [Doc. # 14 at 8].

The Commissioner's argument that plaintiff cannot be considered disabled from bipolar disorder unless her exacerbations exceed the 12-month durational requirement has no support in the Regulations or the caselaw.  Bipolar disorder is "a condition characterized by manic episodes of at least a week, and commonly punctuated by hypomanic episodes and major depressive episodes." *Beckwith v. Saul*, 2020 WL 3428968, at *1 (D. Neb. June 23, 2020) (citing Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 123-32 (5th ed. 2013)) [hereinafter "DSM-5"].  "Most people who have a single manic episode go on to have recurrent mood episodes, and most manic episodes occur before major depressive episodes." *Id.* (citing DSM-5 at 130).  "Co-occurring mental disorders

---

noted that plaintiff believed her symptoms were currently controlled, but she presented as flat and lethargic.  He diagnosed her with bipolar I disorder and assigned her a GAF of 50-55.  Dr. Spencer believed plaintiff had moderate impairment in her ability to interact socially, and "even more so" in her ability to adapt to change in the workplace.  He believed she would need help managing her benefits.  (Tr. 446-50.)  The ALJ did not consider this opinion as it was rendered before her alleged onset date.  (Tr. 28.)

are common—most frequently anxiety disorders (about three-quarters of individuals), and substance use (primarily alcohol) disorder (over half of individuals)." *Id.* (citing DSM-5 at 132).  "Finally, during a manic episode, individuals often do not think they are ill or in need of treatment and can 'vehemently resist' efforts to be treated." *Id.* (citing DSM-5 at 129).   The Regulations provide as follows:

> 4. How we evaluate mental disorders involving exacerbations and remissions.
>
> a. When we evaluate the effects of your mental disorder, we will consider how often you have exacerbations and remissions, how long they last, what causes your mental disorder to worsen or improve, and any other relevant information. We will assess any limitation of the affected paragraph B area(s) of mental functioning using the rating scale for the paragraph B criteria. We will consider whether you can use the area of mental functioning on a regular and continuing basis (8 hours a day, 5 days a week, or an equivalent work schedule). We will not find that you are able to work solely because you have a period(s) of improvement (remission), or that you are disabled solely because you have a period of worsening (exacerbation), of your mental disorder.
>
> b. If you have a mental disorder involving exacerbations and remissions, you may be able to use the four areas of mental functioning to work for a few weeks or months. Recurrence or worsening of symptoms and signs, however, can interfere enough to render you unable to sustain the work.

APPENDIX 1–PART–A2 TO SUBPART P OF PART 404—LISTING OF IMPAIRMENTS, 20 C.F.R. Pt. 404, Subpt. P, App. 1, Sec. 12.00(f)(4)(b).

Therefore, plaintiff need not be experiencing exacerbations (which in this case led to her being repeatedly hospitalized) for "a period of at least 12 continuous months" or more to satisfy the durational requirement needed to find plaintiff

disabled, and the ALJ substantially erred in so finding.  Instead, the Regulations required the ALJ to consider whether plaintiff could "use the area of mental functioning on a regular and continuing basis (8 hours a day, 5 days a week, or an equivalent work schedule)" with due consideration that the "recurrence or worsening of symptoms and signs, however, [could] interfere enough to render [plaintiff] unable to sustain the work." *Id.*  Thus, the appropriate inquiry is whether plaintiff's bipolar disorder, which includes periods of exacerbations and remissions, meets the durational requirement, not whether the exacerbations themselves exceed the 12-month period.

Moreover, the ALJ substantially erred by failing to consider whether plaintiff's medication noncompliance was a symptom of her bipolar disorder. Contrary to the Commissioner's argument, the ALJ explicitly considered plaintiff's medication noncompliance when fashioning her RFC because she concluded that "when compliant with treatment" plaintiff had the ability to perform simple, routine tasks with minimal changes in job setting and duties.  Yet plaintiff was repeatedly diagnosed with medication noncompliance by her treating physicians. (Tr. 515, 751, 753, 803, 812-16, 590, 548, 878.)  She was also noted to be a "poor historian" with respect to her history of medication compliance.  While plaintiff did state on one occasion that she could not afford her medications, that does not negate the substantial evidence of record regarding plaintiff's repeated diagnoses

20

of medication noncompliance.  Plaintiff's stated inability to afford her medication does not, as the Commissioner argues, provide the ALJ with an adequate excuse to simply ignore plaintiff's noncompliance with her medication regimen by fashioning her RFC without consideration of this as a symptom of her bipolar disorder.[6]  RFC is defined as "what [the claimant] can still do" despite his "physical or mental limitations."  20 C.F.R. § 404.1545(a).  Here the ALJ substantially erred by formulating plaintiff's RFC without consideration of all of her mental limitations.  The ALJ must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.  *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000) (citing *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995)).

Plaintiff relies on the Eighth Circuit Court of Appeal's decision in *Pate-Fires v. Astrue*, 564 F.3d 935 (8th Cir. 2009), to support her position.  In that case, the Eighth Circuit noted that "federal courts have recognized a mentally ill person's noncompliance with psychiatric medications can be, and usually is, the 'result of [the] mental impairment [itself] and, therefore, neither willful nor without

---

[6] Moreover, "'a lack of sufficient financial resources to follow prescribed treatment to remedy a disabling impairment may be an independent basis for finding justifiable cause for noncompliance with prescribed treatment.'"  *Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004) (quoting *Tome v. Schweiker*, 724 F.2d 711, 714 (8th Cir. 1984)) (alterations omitted).

a justifiable excuse.'" *Id.* at 945 (quoting *Mendez v. Chater*, 943 F. Supp. 503, 508 (E.D. Pa.1996) and citing *Sharp v. Bowen*, 705 F. Supp. 1111, 1124 (W.D. Pa.1989)); *Frankhauser v. Barnhart*, 403 F. Supp. 2d 261, 277–78 (W.D.N.Y. 2005) (holding an ALJ must take into account whether a mentally ill (bipolar and personality disordered) claimant's failure to comply with prescribed treatment results from the mental illness itself); *Brashears v. Apfel*, 73 F. Supp. 2d 648, 650–52 (W.D. La. 1999) (remanding case for consideration of whether the claimant's noncompliance with prescribed treatment was excusable due to a mental impairment).  The Eighth Circuit reversed the ALJ's decision because "the ALJ failed to make the critical distinction between Pate–Fires's awareness of the need to take her medication and the question whether her noncompliance with her medication was a medically-determinable symptom of her mental illness."  *Pate-Fires*, 564 F.3d at 945.   The Court held:

> Courts considering whether a good reason supports a claimant's failure to comply with prescribed treatment have recognized psychological and emotional difficulties may deprive a claimant of "the rationality to decide whether to continue treatment or medication." See, e.g., *Zeitz v. Sec'y of Health and Human Servs.*, 726 F. Supp. 343, 349 (D. Mass. 1989) (recognizing claimant's agoraphobia, a psychosomatic anxiety-related disorder, "may defy any generally prescribed treatment requiring the will of the individual claimant to recover," such that claimant's failure to follow prescribed treatment, including taking prescribed medications and attending group therapy sessions, did not render claimant ineligible for disability benefits); *see also Thompson v. Apfel*, No. 97CIV.7697, 1998 WL 720676, at *6 (S.D.N.Y. Oct. 9, 1998) (holding ALJ erred in failing to consider whether claimant's psychological and emotional difficulties deprived claimant of the rationality to decide whether to continue treatment or

22

medication).  Thus, while there may be substantial evidence to support the ALJ's finding Pate–Fires knew she needed to take her medication, this evidence does not resolve the relevant question here: wether her failure or even refusal to follow the prescribed treatment was a manifestation of her schizoaffective or bipolar disorder. In this regard, there is no medical evidence, i.e., a discussion by a doctor or other professional, which indicates Pate–Fires's noncompliance at any time was a result of something other than her mental illness.

*Id.* at 945-46.  The Commissioner's attempt to distinguish *Pate-Fires* by arguing

that the record "does not establish that plaintiff's noncompliance with treatment

was caused by her mental impairment" is unavailing.  As in *Pate-Fires*, there is

"no medical evidence, i.e., a discussion by a doctor or other professional, which

indicates [plaintiff's] noncompliance at any time was a result of something other

than her mental illness."  *Id.*  Instead, the substantial medical evidence of record

establishes that plaintiff was repeatedly diagnosed by numerous medical

professionals with medication noncompliance and bipolar disorder.  Like Pate-

Fires, plaintiff's symptoms were severe enough to warrant repeated

hospitalizations.[7]  The Court concludes that the ALJ's failure to consider whether

---

[7] Unlike Pate-Fires, however, there is no opinion from a treating physician as to plaintiff's mental residual functional capacity.  The only opinion from an examining physician as to plaintiff's mental functional capacity is from consulting psychologist Thomas Spencer, Psy.D. from 2009.  (Tr. 446-49.)  The ALJ did not rely upon this opinion as it was rendered seven years before plaintiff's alleged onset date.  However, the ALJ did rely upon the opinion of a non-examining consultative physician from March 31, 2016 when fashioning plaintiff's RFC.  The Court notes that the opinion of a non-examining consultative physician generally does not constitute substantial evidence supporting the ALJ's decision.  *Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999).  Upon remand, the ALJ should order a consultative examination if necessary to evaluate plaintiff's mental impairments and functioning as the ALJ retains the responsibility of developing a full and fair record.  Such an examination may prove especially useful in this case but does not relieve plaintiff of the ultimate responsibility of proving she is disabled.

plaintiff's medical noncompliance is a symptom of her bipolar disorder "is tantamount to the ALJ 'playing doctor,' a practice forbidden by law." *Id.* at 946-47 (citing *Rohan v. Chater*, 98 F.3d 966 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.")).  In so doing, the ALJ substantially erred, and I cannot conclude that there is substantial evidence on the record as a whole to support the ALJ's decision.

Finally, the plaintiff contends that the ALJ substantially erred by failing to consider whether absences caused by exacerbations would render her unable to work.  Plaintiff was hospitalized for 71 days during a period of 32 months, ranging from two to sixteen days at a time.  The Commissioner once again argues that such extensive unscheduled absences would not render plaintiff unable to work because "the record does not establish a continuous 12-month period in which plaintiff would consistently miss work."  This is simply a restatement of the argument made above, namely that plaintiff's exacerbations themselves must exceed the 12-month durational requirement in order to find plaintiff disabled.  As stated above, this is not the appropriate standard.  The ALJ did not even address the issue of absenteeism in her decision.  The VE in this case testified that missing two or more

---

Therefore, plaintiff should strongly consider submitting an assessment of her mental functioning by her treating psychiatrist if possible.

days of work per month on an ongoing basis would result in the termination of employment.  (Tr. 68-69, 102.)  Given that this case requires remand for reconsideration of whether plaintiff's bipolar disorder renders her disabled, the ALJ should also consider this related issue on remand as well by questioning the VE as to whether unscheduled absences ranging from periods of two to sixteen days at a time would render plaintiff unable to work.

## Conclusion

Because substantial evidence in the record as a whole does not support the ALJ's decision, this matter is remanded to the Commissioner for a consideration of plaintiff's claim in light of all medical records on file and development of any additional facts as needed.  The Commissioner should reevaluate plaintiff's mental impairments under the appropriate standards and order additional consultative examinations, if necessary, to determine her impairments and limitations.   The ALJ should also address the issue of whether plaintiff's absenteeism caused by her impairments precludes employment through appropriate questioning of the vocational expert.  Therefore, I reverse and remand pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this order.  *See Buckner v. Apfel*, 213 F.3d 1006, 1010 (8th Cir. 2000) (finding that remand under sentence four of 42 U.S.C. section 405(g) is proper when the apparent purpose of the

remand was to prompt additional fact-finding and further evaluation of existing facts).

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is reversed and the case is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum and Order.

A separate Judgment in accord with this Memorandum and Order is entered this date.

_____

RODNEY W. SIPPEL

UNITED STATES DISTRICT JUDGE

Dated this 30th day of December, 2020.